STEPHENS, INC., Plaintiff,

v.

UNITED STATES of America,
Defendant (three cases).

Nos. LR–68–C–18, LR–68–C–41 and
LR–69–C–35.

United States District Court,
E. D. Arkansas, W. D.

Oct. 15, 1970.

tively on May 31, 1960, 1964, and 1965. Plaintiff, hereinafter called Stephens, filed tax returns for each of those years and paid the taxes shown by the returns to be due. With respect to each year the Commissioner of Internal Revenue assessed a substantial deficiency. The deficiencies were paid; claims for refunds were denied, and in due course these suits were filed.

There are numerous issues between the parties, only some of which have been submitted to the Court for determination. Other issues have been reserved in the hope that with the submitted issues out of the way agreement can be reached as to other issues now in dispute.

The submitted issues have been tried to the Court; the materials before the Court consist of the pleadings, an agreed pre-trial order and amendments thereto, a detailed stipulation of many facts, oral testimony and documentary exhibits. At the conclusion of the trial the Court called for briefs which were submitted in due course. Later, the Court heard oral argument and still later received and has considered supplemental briefs filed by both sides. This memorandum incorporates the Court's findings of fact and conclusions of law dealing with the submitted issues.

Stephens is the 19th largest investment house in the United States, and it deals in stocks and bonds of all kinds including stocks that are not listed on stock exchanges or registered with the Securities and Exchange Commission. It is a member of the Mid-West Stock Exchange, and is an associate member of the American Stock Exchange. It does not hold a seat on the New York Stock Exchange.

William H. Bowen of Smith, Williams, Friday & Bowen, Little Rock, Ark., for plaintiff.

Johnnie M. Walters, Asst. Atty. Gen., Ben A. Douglas, Atty., Dept. of Justice, Fort Worth, Tex., W. H. Dillahunty, U. S. Atty., Little Rock, Ark., for defendant.

### Memorandum Opinion

HENLEY, Chief Judge.

These three cases, hereinafter referred to collectively as "the case" or "this case," involve the federal income tax liability of Stephens, Inc. of Little Rock, Arkansas, for fiscal years ending respec-

All of the stock in Stephens is owned by W. R. (Witt) Stephens and his brother, Jack T. Stephens. The Messrs. Stephens have been prominent in the financial and business world in Arkansas and elsewhere for many years. Their interests are wide and varied.

In the course of its dealings Stephens frequently acquires a controlling interest in other corporations, and at times operates the businesses of those corporations for longer or shorter periods of time.

Ultimately all securities bought by Stephens are, with possibly minor exceptions, acquired with a view to resale at a profit. Some it expects to sell within a relatively short period of time; other acquisitions it is anticipated will be held for substantial periods before resale. Securities purchased during a given tax year are frequently on hand at the end of that year and at the ends of subsequent years.

Stephens maintains an inventory of securities acquired and held for resale to customers. It also maintains a portfolio of selected securities held by it for investment purposes. All securities acquired by Stephens are placed initially in inventory. Within 30 days after acquiring a given security responsible agents of Stephens determine whether it should be removed from inventory and placed in the investment portfolio.

Profits derived from the sale of securities carried in inventory are reported as ordinary taxable income. When securities carried in the investment portfolio are disposed of, Stephens claims capital gain or loss tax treatment with respect to them.

In determining its ordinary taxable income derived from the sale of inventory securities Stephens must take into consideration its "cost of goods sold." Stocks in inventory at the close of a taxable year are valued at cost or market, whichever is lower, and the closing inventory for one year becomes the opening inventory for the next.

Such inventory treatment of securities is authorized by section 471 of the Internal Revenue Code provided that the taxpayer qualifies as a "dealer in securities" as that term is defined in Income Tax Regulations, section 1.471–5, 26 C.F.R., section 1.471–5.

Under that Regulation, a "dealer in securities" is a merchant of securities who has a regular place of business, and who is regularly engaged in the purchase of securities and their resale to customers, that is to say, one who, as a merchant, buys securities and sells them to customers with a view to the gains and profits that may be derived therefrom. A dealer in securities may also acquire securities not for resale to customers but for the purpose of investment or speculation; but he is not considered a "dealer in securities" with respect to securities so acquired and held.

Securities acquired and held for investment or speculation are capital assets and are entitled to capital gain (or loss) treatment if the dealer so acquiring and holding them complies with section 1236 of the Code. That section provides that the dealer is not entitled to such treatment *unless* within 30 days after acquisition of the security in question he clearly identifies it as being held for investment or speculation and thereafter does not hold it primarily for sale to customers in the ordinary course of his trade or business.

Stephens is in business to make money legitimately. It is not in the business of tax avoidance, and it does not engage in tax maneuvers for their own sake. However, the management of Stephens is keenly aware that plaintiff's dealings have tax consequences. Such consequences are quite properly and legitimately taken into consideration when Stephens is contemplating buying a given security and in its dealings with the security after its purchase. And Stephens is quick and diligent to take full advantage of all available and legitimate opportunities and loopholes to be found in the federal tax laws.

The record before the Court covers generally the period from 1960 through 1965; one aspect of the case carried us as far back as 1952. During that overall period of time plaintiff acquired

and disposed of five Arkansas business enterprises, namely:

1. The water works properties in the City of El Dorado. Those properties were bought in 1952 by Stephens and by T. J. Raney & Sons, a partnership; in the same year the business was incorporated as El Dorado Water Co. In 1959 Stephens acquired the Raney stock and thereafter sold the assets to the City of El Dorado. The corporate name was then changed to Stephens Finance Co. In 1963 the corporate stock was sold to Hot Springs Corporation.

2. One half of the capital stock of Public Utilities Co. of Crossett, Arkansas (PUC) was bought by Stephens in 1963; the other half was bought by Raney Investment Co., Inc., and Raney Securities Co., Inc. Later in 1963 PUC was dissolved and was supplanted by two new corporations, Public Utilities Corporation of Crossett, Inc. and Crossett Water Co., Inc. Prior to December 31, 1963, Stephens sold its interest in the Crossett operations.

3. All of the capital stock of Little Rock Tent & Awning Co., the name of which was later changed to Tuf-Nut Manufacturing Co., was bought by Stephens in early 1965; that stock was sold in July of that year.

4. All of the capital stock of Hollis & Co. was bought in 1962. By May 31, 1965, 10 percent of it had been sold.

5. All of the capital stock of V. E. Schevenell, Inc. was purchased on November 11, 1963, and was sold on December 13, 1963.

The El Dorado properties were bought from General Water Works Company of Pine Bluff, Arkansas. The stocks in the other corporations were closely held; none was listed on any stock exchange or was traded generally, or was registered with the Securities and Exchange Commission. There was no general public demand for the stocks.

All of the corporations, including El Dorado Water Works Co. after it was formed, were solvent corporations with substantial net worths. All of them had equities that were disproportionate to current earnings. As a result, the stocks were not readily saleable at their book values which were tantamount to their "market values."

The stocks that have been mentioned were not placed in the investment portfolio; all of them were treated as inventory stocks. In each instance Stephens (or Stephens and Raneys to the extent involved) caused the corporations issuing the stocks to declare and pay large cash dividends to Stephens (or to Stephens and Raneys to the extent involved). In each instance the inventory value of the stocks was "written down" to reflect the reductions in market values caused by the dividends. In each instance the stock was sold at or near the written down value.

With respect to the dividends paid to plaintiff, the plaintiff took the dividends received credit or deduction authorized by section 243 of the Code. In four instances out of the five that credit or deduction amounted to 85 percent of the dividend received. In the fifth case the credit amounted to 100 percent of the dividend.

The inventory write downs resulted in an increased cost of goods sold by plaintiff in the tax years involved here and were of substantial tax benefit to Stephens in connection with its overall operations during the years in question.

The transactions that have been outlined down to this point have given rise to controversy between the parties with respect to all five corporations that have been mentioned. There is another and entirely separate controversy arising out of the alleged "liquidation" or "reorganization" of PUC which took place in late November and early December, 1963. The Court will dispose first of the questions common to all of the stocks and will then dispose of the PUC controversy.

### I.

The Government does not deny that Stephens was and is a "dealer in securi-

ties" in a general sense; but the Government does deny that Stephens was a "dealer in securities" with respect to the particular stocks here involved. The Government's theory is that while none of these stocks were ever put in plaintiff's investment portfolio or otherwise identified as investment stocks, nonetheless they were in fact acquired for investment or speculation and were not entitled to inventory treatment.

Plaintiff says that the stocks were bought for resale and not for speculation or investment. Plaintiff goes further, however, and advances a more fundamental contention which the Court will discuss at this point.

The contention is that a stock bought by a dealer in securities is either an inventory stock or an investment stock, and that regardless of his subjective intent when he acquired the stock the dealer has the option of determining how the stock is to be treated for tax purposes and that if he does not exercise the option expressly by identifying the stock as investment stock, it is automatically inventory stock so that the dealer is entitled to include it in his inventory and value it at the end of the year at cost or market, whichever is lower.

[1] The Court does not accept the contention. True, a given stock cannot at the same time be an investment stock subject to capital gain treatment and "dealer stock" entitled to be included in inventory. But, the fact that it is not the one does not mean that it is necessarily the other. A stock that is in fact investment stock cannot properly be included in inventory. It may or may not be entitled to capital gain (or loss) treatment depending upon whether the dealer complied with section 1236. If a stock is actually acquired and held for investment or speculation, it does not lose its character of investment stock simply because the dealer fails to comply with section 1236 and thereby loses his right to capital treatment with respect to it. The Court thinks that support for this view is found in the recent decision of the

Court of Claims in Brown v. United States, 426 F.2d 355.

The question, then, is whether as a matter of fact Stephens acquired the respective stocks for the purpose of resale or whether it acquired them for the purpose of holding them for investment or speculation. To that question the Court will return in due course.

II.

Government contends that the tax advantages claimed by Stephens were properly disallowed under section 269 of the Code. That section provides that if a taxpayer acquires control of a corporation for the principal purpose of avoiding federal income tax liability by securing the benefit of a deduction, credit or other allowance to which such taxpayer would not otherwise be entitled, a claim of such deduction, credit or allowance may be denied.

The Government argues that plaintiff impermissibly acquired control of the several corporations for the primary purpose of claiming the dividends received credit and on the basis of the dividends writing down the·inventory values of the stocks, which credits and write downs would have been unavailable to Stephens but for the acquisitions of corporate control.

That argument has some appeal but the Court does not accept it. Section 269 has been limited in application to situations in which a prosperous taxpayer has acquired control of a less prosperous corporation for the purpose of taking advantage of the acquired corporation's favorable tax opportunities. Zanesville Investment Co. v. C.I.R., 6 Cir., 335 F.2d 507; Cromwell Corporation v. C.I.R., 43 T.D. 313; Coastal Oil Storage Co. v. C.I.R., 25 T.C. 1304; Commodores Point Terminal Corporation v. C.I.R., 11 T.C. 411. Such a situation is not presented here since none of the acquired corporations had losses, loss potentials, or other tax advantages which would inure to the benefit of Stephens upon acquisition.

Alternatively, Government argues that in no event should plaintiff be permitted to take advantage of both the dividends received credits and the inventory write downs. That, the Government says, would be to allow Stephens "double deductions," which allowance the Government asserts to be improper and impermissible. The Government relies on United States v. Skelly Oil Co., 394 U. S. 678, 89 S.Ct. 1379, 22 L.Ed.2d 642. The Court does not think that the case is in point and rejects the Government's argument.

■ A taxpayer has a perfect right to take advantage of all of the leverage that the tax laws give him, and he is not to be deprived of that right simply because his situation gives him more leverage than the Internal Revenue Service thinks that he ought to have. Nor is a taxpayer forbidden to kill two birds with one stone if he can do so under the tax laws as written.

■ If the payments received by Stephens were dividends, Stephens was entitled to take the statutory credit for them, and if the stocks were inventory stocks in the first place, Stephens was entitled to write them down to market value if that value was less than cost notwithstanding the fact that the decrease in value was largely due to the impact of the dividends on the corporate balance sheets.

As to the character of the payments received by Stephens from the corporations, this Court has always had some difficulty with treating those payments as "dividends." It seems to the Court that from a practical standpoint the payments were nothing more than recoupments by Stephens of part of the cost of the stocks and could, and perhaps should, have been so treated for tax purposes. Under that theory no part of the payments would have been subject to taxation as dividends, nor would there have been any occasion to write down the inventory values of the stocks, assuming that they were properly included in inventory. They would simply have gone on the books at their net cost to Stephens.

However, both sides have been willing to treat the payments as true dividends, and the Government does not question the taking of the dividends credits standing alone. If that approach is satisfactory to the parties, as it apparently is, the Court will not quarrel with it.

Some may think it "unfair" to permit a corporate taxpayer which is in a position to do so to gain the tax advantage which Stephens was able to obtain in the manner that has been described. But, concepts of equity and fair play are not invariably incorporated in the tax laws. See the dissenting opinion of Justice Douglas in United States v. Skelly Oil Co., supra. And some transactions involve tax benefits to the Government which may be considered "unfair" or "unjust." Indeed, under the Court's suggested characterization of the dividends payments, it would be arguable that it was "unfair" to tax Stephens on even 15 percent of those payments.

■ If there are undesirable provisions in the tax laws, it is the function of the Congress, not the Courts, to change them.

### III.

■ The question now recurs as to whether Stephens bought the stocks for resale so that it would be entitled to carry them in inventory. On that issue the burden of proof is upon the plaintiff as to each of the stocks in question.

■ The Court finds from a preponderance of the evidence that with respect to the stocks of PUC, Little Rock Tent & Awning, Hollis & Co., and Schevenell Stephens was a "dealer in securities" within the meaning of Internal Revenue Regulations, section 1.471-5 and was entitled to accord inventory treatment to those stocks. With regard to the stock of El Dorado Water Co. the Court finds that plaintiff has failed to discharge its burden.

The stipulated facts and the testimony reflect, and the Court finds, that plaintiff bought and PUC, Little Rock Tent & Awning Co., Hollis & Co , and Schev-

enell stock for the purpose of reselling them and not for the purpose of holding them for investment or speculative purposes. As a matter of fact those stocks were not of a type which normally would be bought as investments by a dealer in securities or by anyone else; more properly speaking perhaps, the corporations in question were not of such nature as would make their stocks attractive for investment or speculative purposes.

The Court also finds that plaintiff intended to make a profit out of its dealings with all of those securities. It is true that substantial profit proved not to be made from the resales proper, but the Court does not read the Regulation as requiring that the dealer's anticipated or hoped for profit be derived entirely from the resale itself. Regard is to be had to the overall dealings with the respective stocks.

The testimony of Vernon Giss, a Vice President of Stephens and its Secretary-Treasurer, was to the effect that the book values of the stocks were so high that the stocks were not readily saleable at those values; that when the stocks were bought by Stephens it was contemplated that the dividends would be declared and the values of the stocks written down. As the Court has suggested heretofore, and as Mr. Giss testified, the dividends enabled Stephens to recover some of its costs ; also the reduction of the inventory values of the stocks made them more marketable. Indeed without the write downs Stephens probably could not have sold the stocks and could not have made a profit on its overall transactions with them.

The Government points to the fact that in connection with some of the corporations plaintiff provided managerial services and arranged for financing. Admittedly, an ordinary merchant has no occasion to do those things for his suppliers. Such a course of conduct, however, in some instances may be pursued by a dealer in securities. Where one corporation dealing in securities buys all of the stock of another corporation or a controlling interest in it, and where the stock cannot be sold immediately, the buying corporation may be required to exercise control of the affairs of the acquired corporation if that concern is to function, and for the same reason the former corporation may be required to arrange financing for the latter. Moreover, improvement in corporate management has an obvious tendency to improve the marketability of the stock and to increase its market value.

As stated, the Court does not find from a preponderance of the evidence that Stephens was a "dealer in securities" with respect to the stock of El Dorado Water Co.

To start with, Stephens did not "buy" the stock of the water company from any third person or persons in the sense that it bought the stock in the other corporations. The parties have stipulated that in 1952 plaintiff and T. J. Raney & Sons, a partnership, bought the water works property from General Water Works Co. of Pine Bluff, Arkansas. The water works was later incorporated and one half of the stock was issued to Stephens and the other half was issued to T. J. Raney & Sons. There were two classes of stock. The preferred stock was sold between 1952 and 1959 to customers of Stephens, but during that period there were no sales of common stock.

When the assets were acquired originally the water works was a going concern and had good management and earnings. The Court thinks that the assets were acquired to be operated for an indefinite period of time, and that the corporation was not formed for the purpose of selling its stock other than the preferred stock that is not in controversy here. Indeed, by 1952 probably the only prospective purchaser was the City of El Dorado itself, and it seems that its legal authority to buy or condemn corporate stock was in question although there was no doubt that the City had the power under Arkansas law to buy or condemn the physical plant.

By July 1959 Stephens had arranged to sell the properties to the City of El Dorado and in connection with that ar-

rangement it bought the stock in the water company owned by the Raneys. After the sale of the assets to the City, El Dorado Water Company's assets consisted entirely of cash, accounts receivaable, and notes receivable. Early in 1960 the name of the company was changed to Stephens Finance Co. Immediately thereafter Stephens received a large dividend from the Finance Co. and wrote down the value of the stock correspondingly. From 1960 to May 8, 1963, Stephens Finance Co. was engaged in the business of making substantial loans. On the date last mentioned Stephens sold its stock in the Finance Company to a concern known as Hot Springs Corporation at book value.

Although Stephens certainly made a profit on the sale of the water assets to the City of El Dorado, and although it may have made a profit on the ultimate sale of the stock to Hot Springs Corporation, the Court is not convinced that it acquired or held that stock for resale in any conventional sense or that it was a "dealer in securities" with respect to that stock.

### IV.

There remains for consideration the controversy about the liquidation/reorganization of PUC in the late fall of 1963. And it is this controversy that has given the Court its greatest difficulty.

Prior to the transactions in question PUC had supplied to the citizens of the City of Crossett all four public utility services. By early 1963 Stephens had acquired one-half of the stock in PUC, and the other half had been acquired by Raney Investment Co., Inc. and Raney Securities Co., Inc. The stock was placed in the respective inventories of the purchasers at cost; there was the usual dividend (in fact two) declared in favor of the purchasers; and there was the usual write down of the inventory value of the stocks.

On the 19th of July, 1963, Stephens filed with the SEC a claim for exemption from the provisions of the Public Utility

Holding Company Act of 1935 with which Stephens did not wish to comply. It was the understanding of Stephens personnel that if the company was not to come under the Act with respect to PUC it would have to dispose of its stock in that company within a comparatively short time, probably within a year after the acquisition.

The Stephens-Raney acquisition of the shares in PUC was strongly opposed by a substantial number of Crossett residents who believed that the public utilities in the City should be publicly owned, and there was talk of condemnation. While it was doubtful that the City could condemn the electric, gas, and telephone utilities, there was no question that it could condemn the water utility.

That situation in itself indicated the desirability of severing the water utility from the other three. In addition, the water utility had not been making money; it needed a rate increase, and there was a better chance of its getting one if it was placed on its own feet as a separate utility company.

On November 5, 1963, a joint special meeting of all of the stockholders and directors of PUC was held in the City of Little Rock. By a resolution unanimously approved the stockholders and directors adopted a "Plan Of Complete Liquidation And Dissolution of Public Utilities Company of Crossett."

The plan contemplated that as of November 29, 1963, PUC would be completely liquidated and dissolved and that all of its assets would be turned over to a liquidating trustee. PUC's attorney, Mr. R. H. Thornton, Jr., who was also one of its stockholders, was directed to file as soon as possible with the Arkansas Public Service Commission an application for leave to dissolve the company, which application was to represent that the stockholders of PUC would cause public utility service to be provided to the service areas without interruption. The plan then recited:

" * * * Although the complete liquidation and dissolution of this Corporation shall be a taxable transaction,

taxable to the stockholders as provided by Section 331 of the Internal Revenue Code, it is the intention of the stockholders, subject to the approval of the appropriate Regulatory Agencies, that they will cause two new Corporations to be organized under the laws of the State of Arkansas to which the net assets received by them upon liquidation of the Corporation shall be transferred. Upon receipt of the assets and the assumption of the liabilities these two Corporations shall operate and provide the utility service to the service areas previously served by Public Utilities Company of Crossett."

On November 14, 1963, Public Utilities Corporation of Crossett, Inc. (Utilities). and Crossett Water Co., Inc. (Water), were formed as Arkansas corporations. The incorporators were Vernon Giss and R. H. Thornton, Jr., who have been mentioned, and Rose Jolley, evidently an employee of Stephens.

On the following day PUC, Utilities, and Water filed a joint application with the Public Service Commission asking for administrative approval of a proposed plan of *reorganization* along the following lines:

(a) PUC was to be *liquidated.*

(b) Corporation would buy from PUC stockholders all of the assets and assume all of the liabilities distributed to the stockholders as a result of the liquidation, except the assets and liabilities to be acquired and assumed by Water. Specifically, Utilities agreed to assume current liabilities and long term debts aggregating $1,115,377.57, "plus the sum of $1,199,872.92 payable in common stock issued by the Utilities Corporation."

(c) Water would buy and assume the rest of the assets and liabilities. The liabilities to be assumed amounted to $282,873.50, "plus the sum of $336,431.93 payable in common stock issued by the Water Company."

(d) Water agreed to supply water service to Crossett residents, and Utilities undertook to supply the other utility services.

The application then went on to say that the "proposed reorganization" should have a favorable effect on the two new companies, should be beneficial to utility customers, was in the public interest, and reflected the reasonable value of the property, plant, equipment, and other assets of the parties.

The application was granted by the Commission after a hearing on November 26, 1963, and on the same day the stockholders of PUC entered into a trust agreement containing substantially the following provisions:

1. All assets and liabilities of PUC were to be turned over to the trustee and held by him in trust for the stockholders.

2. The trustee was to convey appropriate assets and liabilities to Water in exchange for 3,000 shares of stock in Water. The other assets and liabilities were to be transferred to Utilities in exchange for 11,000 shares of the stock of Utilities.

3. While certificates covering the 14,000 shares of stock that have been mentioned were to be delivered initially to the trustee, they were to be issued in the names of the stockholders of PUC, including Stephens. Each of those stockholders was to receive a specified number of shares in Utilities and a specified number of shares in Water.

The Court will observe at this point that the total number of shares to be issued by Utilities and Water collectively was only 10 shares less than twice the number of outstanding shares in PUC immediately prior to its intended dissolution, and the total number of shares in both new corporations that each PUC shareholder was to receive was approximately, in some cases exactly, twice the number of shares that it or he owned in PUC.

It is also to be observed that none of the documents that have been abstracted by the Court indicated that any PUC stockholder would be required, or that any intended, to divest itself or himself of shares in either Utilities or Water after those shares were delivered by the trustee.

On November 29 a certificate of dissolution of PUC was filed with the Arkansas Secretary of State. On December 2 the assets and liabilities of PUC were transferred to Utilities and Water pursuant to the plan, and presumably Utilities and Water delivered their stock certificates to the trustee who in turn delivered them to the former PUC stockholders.

On December 24, 1963, the stockholders in Water surrendered their stock to Utilities in exchange for Utilities stock on a one for one basis. Thus Water became a wholly owned subsidiary of Utilities.

Prior to December 31, 1963, all of Utilities' shares were sold by the former PUC stockholders to 24 identified individuals, most of whom are prominently connected with the Stephens and Raney interests. The shares in Utilities that were owned by Stephens were sold to W. R. and Jack Stephens.

The record, supplemented by the briefs, sets out in some detail what happened with respect to Utilities and Water after the close of 1963. The Court has considered those happenings for whatever they may be worth but does not deem it necessary to relate them here; there is no dispute about them.

Section 311(a) (1) of the Code provides that amounts distributed to shareholders in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock. Both sides agree that where there is a complete liquidation under section 331, a liquidation dividend received by a stockholder is treated as involving a capital gain or capital loss as the case may be.

Plaintiff says that the November-December, 1963, transactions that have been described amounted to a section 331 liquidation. The Government says that those transactions amounted to nothing more than a tax free reorganization falling within one or more of the definitions of "reorganization" appearing in section 368(a) (1) of the Code, particularly section 368(a) (1) (D) read in connection with section 355, section 368 (a) (1) (E) or (F).

There is nothing new about controversies between taxpayers and the Government as to whether corporate demises have amounted to section 331 liquidations or whether they have been simply reorganizations. There are many cases on the subject.

Such a controversy arises typically when a stockholder-taxpayer receives a large sum of money in connection with the termination of the life of an original corporation but immediately appears as a stockholder in some other corporation which has acquired the operating assets of the former corporation. See Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders (2d Ed.) section 9.05, pp. 349–350. In such a case the taxpayer contends that the first corporation was "liquidated" under section 331, and the Government contends that there was but a reorganization.

This is not a typical case because here Stephens obtained its cash payment from PUC substantially before the November-December events and treated that payment as an ordinary corporate dividend subject to normal income taxation. Indeed, considering Stephens as a corporate entity standing alone and apart from W. R. and Jack Stephens or some other Stephens controlled corporation or corporations, it is hard for the Court to see what this particular controversy is really about.

However, the controversy is here; the parties want it decided, and the Court will endeavor to do so. It seems clear that PUC was either "liquidated" or "reorganized." The burden is on the plaintiff to establish the liquidation which it postulates.

In Pridemark, Inc. v. C.I.R., 4 Cir., 345 F.2d 35, 41, the Court had this to say about what constitutes a section 331 liquidation:

> "The Code provides no definition of 'complete liquidation.' We reject the simplistic argument of the taxpayer that the phrase refers only to the

measures required by state law to terminate a corporation's legal existence. No reason is offered as to why the observance of such mechanical procedures would prompt Congress to treat as stock redemptions payments that are in reality dividends. A more convincing indication of what distributions are meant to be accorded favored treatment is found in an early report of the Senate Finance Committee. S. Rep. No. 398, 68th Cong., 1st Sess., 12 (1924). There a distribution in complete liquidation was analogized to a sale of stock in that the shareholder 'surrenders his interest in the corporation and receives money in place thereof.' The corporation must have ceased to be a going corporate concern, or if the enterprise is continued in corporate form, the shareholder must have disassociated himself from it. See Regs. 1–332–2(c) (1955). If the liquidated business is not resumed by the new corporation as a continuation of a going concern, there is a 'complete liquidation.' * * * "

There is no question that PUC ceased to exist as a corporation on November 29, 1963, and that its assets and liabilities passed into the hands of the trustee. Nor is there any question that on December 2 those assets and liabilities were passed on to the new corporations which issued their stock in payment therefor, which stock was turned over to the former PUC stockholders. It is also unquestioned that Stephens and the Raney corporations sold their stock to individuals prior to December 31, 1963. While the record is not entirely clear, it is inferable that those sales were not made until after Water had become a subsidiary of Utilities. If so, the sales to the individuals took place between December 24 and December 31.

If PUC's overall plan had stipulated that the certificates of stock in Utilities and Water would be issued in the name of the trustee, and that he would sell the stock to outsiders and turn the money over to the former PUC stockholders, the

Court would have no difficulty in finding a section 331 liquidation.

As has been seen, however, the plan did not so provide, and the transactions were not handled in that way. Immediately after the events of December 2, 1963, the same corporations and people which and who had owned PUC four days before were the owners of Utilities and Water, and the proportions of ownership were substantially the same. And Utilities and Water were carrying on the same business that had been carried on by PUC. And that situation continued to exist until probably the last week in December.

In the last analysis, the Court is concerned here with what the stockholders of PUC did, not what they might have done, or what they say that they did, or what they intended to do.

█ Granting that the supplanting of PUC with Utilities and Water was not a "tax dodge," and that there were valid business reasons for every step taken by the PUC stockholders, it seems to the Court that the business objectives involved could have been achieved as well by means of and after a reorganization as by means of and after a liquidation. And regardless of what was intended to be done with PUC and of what its directors and stockholders may have tried to do with it, the Court is not persuaded by a preponderance of the evidence that they actually did anything more than reorganize it into two corporations, admittedly a change in business form and identity, but with no substantial change of ownership or operation.

It is true that the situation that was created did not last very long, but it was what it was as long as it lasted, and the Court is not convinced that the fact that its duration was short was more than a coincidence or that it is of controlling importance.

An order will be entered adjudicating the submitted issues in accordance with the foregoing.