BERTRAM H. SLATER AND LINDA GAY SLATER, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4068-73.     Filed July 16, 1975.

*William E. Collins* and *J. Mike Holt,* for the petitioners.
*John D. Copeland,* for the respondent.

SIMPSON, *Judge:* The Commissioner determined the following deficiencies in the petitioners' Federal income taxes:

| Year | Deficiency |
|------|-----------|
| 1967 | $5,442 |
| 1968 | 338 |
| 1969 | 354 |
| 1970 | 6,260 |

It must be decided whether the transfer of certain rights in stock to secure employment and the subsequent loss on the sale of the stock gave rise to a trade or business expense within the meaning of section 162(a) of the Internal Revenue Code of 1954. In the alternative, we must decide whether *Arrowsmith v. Commissioner,* 344 U.S. 6 (1952), applies to the acquisition of the stock and its subsequent sale at a loss, or whether, alone, the transfer of the stock rights constituted a trade or business expense. Sec. 162(a).

### FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioners, Bertram H. Slater and Linda Gay Slater, husband and wife, resided in Dallas, Tex., at the time of filing their petition herein. They filed joint Federal income tax returns for the years 1967 through 1970 with the District Director of Internal Revenue, New York, N.Y.

On June 3, 1968, Mr. Slater entered into a 3-year employment agreement with the A. S. Beck Shoe Corp. (Beck). The agreement included a covenant by Mr. Slater not to compete with Beck for 6 months after the termination of his employment. Mr. Slater was engaged to oversee all of Beck's financial matters, including its acquisitions and divestitures and a proposed public offering of

securities intended to secure funds to retire Beck's short-term debt. As part of his compensation, Mr. Slater was given the right to purchase 4,000 restricted shares of Beck's common stock.

The stock was sold to Mr. Slater in June 1968 for $35,000, when its fair market value was $55,000. As payment for the stock, Mr. Slater gave Beck his promissory note for $35,000 payable in 1 year, and the stock was held in escrow as security for payment of the note. In June 1969, Mr. Slater paid off the note with $15,000 of his own funds and $20,000 he had borrowed from the Chase Manhattan Bank (Chase) on a demand note secured by the stock. The restrictions on the transfer of the stock were removed in July 1969, and Mr. and Mrs. Slater reported as additional ordinary income the $20,000 bargain element on their 1969 Federal income tax return.

At the end of July 1970, Mr. Slater terminated his employment with Beck and began looking for another position. His efforts were unsuccessful until late September 1970, when Universal Container Corp. (Universal) offered him a position as a financial consultant. At such time, he was unable to accept the offer because of his covenant not to compete with Beck. Universal agreed to keep the offer open if Mr. Slater secured a release from Beck in the near future.

On November 2, 1970, Mr. Slater and Beck entered into a letter agreement in which Beck agreed to release him from the covenant not to compete and in which he transferred to Beck certain rights with respect to the 4,000 shares of Beck stock. Mr. Slater promised to deliver to Beck any of the stock Chase should release after full or partial payment of his debt to it and to transfer to Beck any proceeds in excess of the loan balance should Chase sell the stock to satisfy the debt. After the letter agreement was executed, Mr. Slater began working for Universal.

Beck had severe financial problems in 1970. It had accumulated a large amount of short-term debt that it planned to retire through a public offering of securities. However, the underwriter working on the offering withdrew in 1970, and it was unable to carry out such plan. On November 2, 1970, Beck's stock was worth $2.75 a share; it had been selling for as much as $40 a share in 1969. Chase sold Mr. Slater's 4,000 shares in December 1970 for approximately $1.37 a share and applied the proceeds to reduce the balance of his debt. In 1971, the price of Beck's stock fluctuated between less than $1 and $4 a share until Beck was

reorganized under the Federal Bankruptcy Act in April or May of that year.

Mr. and Mrs. Slater deducted their loss of $49,540 on the sale of the Beck stock as a business expense on their 1970 Federal income tax return. The unused portion of the loss was carried back to 1967, for which a tentative refund of Federal income taxes was allowed. As a result of the claimed decrease in taxable income for 1967, Mr. and Mrs. Slater recomputed their 1968 and 1969 Federal income taxes under the income-averaging method and received tentative refunds for such years. In his notice of deficiency, the Commissioner determined that the loss was a capital loss and disallowed the business expense deduction for 1970 and the tentative refunds for 1967 through 1969.

OPINION

The petitioners presented three alternative positions to support their deduction, in whole or in part, of the loss resulting from the sale of the Beck stock. In the first place, they argued that the full amount of their loss on the sale constituted a trade or business expense since the sale and loss were occasioned by the exigencies of Mr. Slater's trade or business as a financial consultant. They maintained that to secure the employment with Universal, he had to relinquish his rights to the Beck stock, and they relied upon *Leonard F. Cremona*, 58 T.C. 219 (1972), and *David J. Primuth*, 54 T.C. 374 (1970). However, the petitioners' argument is based on a misconception of the facts of the case. Neither the sale of the stock nor the loss on the sale resulted from the transfer of Mr. Slater's rights to the stock in 1970. Before that transfer, the value of the stock had fallen from a high of $40 a share in 1969 to $2.75 a share at the time of the transfer; that decline in value resulted from Beck's financial difficulties and had nothing to do with Mr. Slater's attempt to secure new employment. Moreover, when Chase sold the stock, it did so to satisfy Mr. Slater's debt, and so far as we know, the sale was not at all motivated or influenced by Mr. Slater's transfer of his rights to the stock. In addition, the loss on such sale was due solely to the decline in the value of the stock. Under these circumstances, the loss cannot be found to have been incurred for the purpose of securing new employment, and it is not at all analogous to the payments which were held to be deductible in *Cremona* and *Primuth*.

The petitioners next attempted to justify a deduction of part of their loss by arguing that since they had been taxed on the bargain element as ordinary income, a portion of the loss should be treated as an ordinary loss in accordance with the doctrine of *Arrowsmith v. Commissioner*, 344 U.S. 6 (1952). In that case, it was held that the tax consequences of integrally related transactions should be treated consistently. *Kimbell v. United States*, 490 F. 2d 203 (5th Cir. 1974), cert. denied 419 U.S. 833 (1974). The petitioners maintained that the acquisition and disposition of the Beck stock were integrally related since both transactions grew out of Mr. Slater's employment with Beck. However, such argument is also based on a misunderstanding of the facts. The sale and the loss on the sale were unrelated to Mr. Slater's employment with Beck; that loss, as we pointed out before, was due to the decline in the value of the Beck stock and was not at all related to Mr. Slater's employment with Beck. The only transactions connected with Mr. Slater's employment were the purchase of the stock and the transfer of the stock rights, but those events did not cause the loss on the sale of the stock. When Mr. Slater purchased the stock at a bargain, it was as if he had been paid additional compensation which was used to purchase the stock; thereby, he became an investor in the stock, and any subsequent gain or loss is due to the fortunes of the company. Compare *George Eisler*, 59 T.C. 634 (1973); *John E. Turco*, 52 T.C. 631 (1969). Accordingly, his loss cannot be found to be integrally related to the circumstances under which he acquired the stock, and there is no basis for applying the *Arrowsmith* doctrine.

As their final alternative, the petitioners contended that Mr. Slater transferred stock rights worth $8,000 as payment to Beck for agreeing to release him from the covenant not to compete, and that such amount constituted a trade or business expense. Mr. Slater testified that the rights which he transferred to Beck were analogous to a warrant to purchase the Beck stock for $5 a share, and that the value of such a warrant would be $8,000. Despite Mr. Slater's expertise in financial matters, we were not convinced by his testimony that the rights transferred by him had any significant ascertainable value. Since the stock had been pledged as security for the loan to Mr. Slater, Chase could sell it and apply the proceeds toward the satisfaction of that loan. Although we have no evidence as to how much remained to be paid on the

loan, Mr. Slater seemed to assume that the entire $20,000 remained to be paid. Thus, Beck could acquire nothing as a result of the transfer unless the value of the stock rose from the price of $2.75, at which it was selling at the time of the transfer, to more than $5 a share. From the evidence, we simply are not convinced that as of November 1970, there was any realistic likelihood of such an increase in value taking place. By 1970, the price of the stock had dropped precipitously from its 1969 high of $40 a share. Although it was selling for $2.75 on November 2, 1970, Chase could realize only approximately $1.37 a share when it sold the stock in the following December. During the next year, the stock sold between less than $1 and $4 a share. Mr. Slater professed that as of November 1970, he was still hopeful that Beck could recover, but the nature of its financial difficulties appeared to be such that recovery was in fact unlikely. In late spring of 1971, it was forced into bankruptcy. After considering these circumstances, we are simply not satisfied that the rights transferred by Mr. Slater had any significant ascertainable value in November 1970, and accordingly, we hold that no amount is deductible as an expense under section 162(a) as a result of the transfer.

*Decision will be entered for the respondent.*