T.C. Memo. 2000-361


UNITED STATES TAX COURT



SEAGATE TECHNOLOGY, INC., SUCCESSOR IN INTEREST TO SEAGATE
PERIPHERALS, INC., f.k.a. CONNER PERIPHERALS, INC., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 15086-98.                    Filed November 27, 2000.



        P's controlled foreign corporation, S, sold its
operating assets to an unrelated corporation, C, in
exchange for stock of C.  The parties to the asset sale
executed a lockup agreement prohibiting S from selling
the C stock during a restricted period because C was in
the process of making its initial public offering.
During the restricted period, the price of the C stock
increased.  When the sale restrictions lapsed, S sold
the C stock and realized a gain.  Under secs. 951 and
954, I.R.C., P must include in its U.S. income its pro
rata portion of S' foreign personal holding company
income (FPHCI).  Under sec. 1.954-2T(e)(3)(iv),
Temporary Income Tax Regs., 53 Fed. Reg. 27505 (July
21, 1988), gain from the sale of operating assets used
in S' trade or business does not give rise to foreign
personal holding company income (FPHCI).  Under sec.
954(c)(1)(B)(i), I.R.C., gain from the sale of a
passive investment in stock does give rise to FPHCI.

The parties seek to determine, as a matter of law, whether the relation-back doctrine, established in <u>Arrowsmith v. Commissioner</u>, 344 U.S. 6 (1952), applies for purposes of sec. 954, I.R.C., in characterizing S' portion of the gain relating to the increase in the value of the C stock during the period in which S was prohibited from selling the stock. P contends that, under the relation-back doctrine, the sale of the C stock was integrally related to the sale of the operating assets due to the lockup agreement and the restrictions on re-sale of the C stock, and that the gain on the sale of the stock must take its character from the sale of the assets and does not constitute FPHCI. R contends that the relation-back doctrine does not apply and S' gain on the sale of C stock constitutes gain from a separate investment in stock giving rise to FPHCI taxable to P.

<u>Held</u>: The relation-back doctrine established in <u>Arrowsmith</u> does not apply based on the facts of this case to characterize S' gain on the sale of C stock for purposes of sec. 954, I.R.C., and accordingly the gain on the sale of the C stock constitutes FPHCI.

<u>Mark A. Oates</u>, <u>Thomas V.M. Linquanti</u>, <u>John M. Peterson, Jr.</u>, <u>Mary E. Wynne</u>, and <u>Andrew P. Crousore</u>, for petitioner.

<u>Debra K. Estrem</u>, <u>Michael J. Cooper</u>, <u>Bryce A. Kranzthor</u>, <u>Jeffrey L. Heinkel</u>, <u>Lavonne D. Lawson</u>, <u>Ewan D. Purkiss</u>, and <u>Mark S. Heroux</u>, for respondent.

MEMORANDUM OPINION

GERBER, <u>Judge</u>: Pursuant to Rule 121,[1] this matter is before the Court on the parties' cross-motions for partial summary

---

[1] Unless otherwise indicated, all Rule references are to the Tax Court Rules of Practice and Procedure, and all section references are to the Internal Revenue Code in effect for the taxable years at issue.

judgment.[2]  The parties seek to determine, as a matter of law, whether the "relation-back doctrine" established in <u>Arrowsmith v. Commissioner</u>, 344 U.S. 6 (1952), applies in characterizing petitioner's gain on the sale of stock for purposes of section 954.

Summary judgment may be granted if the pleadings and other materials demonstrate that no genuine issue exists as to any material fact and that a decision may be entered as a matter of law.  See Rule 121(b); <u>Sundstrand Corp. v. Commissioner</u>, 98 T.C. 518, 520 (1992), affd. 17 F.3d 965 (7th Cir. 1994).  There is no genuine issue as to any material fact with respect to the specific legal issue before us, and, accordingly, this matter is ripe for judgment on the contested issue as a matter of law.[3]  See Rule 121(b).

---

[2] Petitioner has filed two motions for partial summary judgment.  This opinion considers what has been denominated in one of those motions as the section 954 "Read-Rite issue".  The other motion for partial summary judgment concerns what has been denominated as the "section 482 cost-sharing issue", which involves the question of whether the cost, if any, of employee stock options should be included as part of petitioner's cost-sharing agreement with its foreign subsidiaries.

[3] While respondent originally believed and argued in his brief that material facts were in dispute, respondent later conceded that the parties' disagreements over the facts focused on interpretations and conclusions drawn from the underlying facts and not on the facts themselves.

Background

Petitioner is the successor-in-interest to Conner Peripherals, Inc., (Conner U.S.), a Delaware corporation. Conner U.S. developed and manufactured hard disk drives for sale to personal computer manufacturers and other customers. Conner Malaysia, a third-tier, wholly owned Malaysian manufacturing subsidiary of Conner U.S. manufactured hard disk drives and head-stack assemblies for hard disk drives in Malaysia.

An Asset Purchase Agreement between Conner Malaysia, Read-Rite Corp. (Read-Rite) and Conner U.S. was executed on August 30, 1991. Pursuant to the Asset Purchase Agreement, Conner Malaysia sold its head-stack assembly operating assets (the "assets") to Read-Rite, an unrelated third party. The deal negotiated between Conner Malaysia and Read-Rite called for Conner Malaysia to sell its assets in exchange principally for Read-Rite stock. At the time the sale was negotiated, Read-Rite was preparing to make its initial public offering of stock (IPO).

Pursuant to the Asset Purchase Agreement, the consideration for the assets consisted of the following:

> 2.1 Read-Rite Shares. On the Delivery Date (as defined in Section 3.2) Read-Rite shall deliver to Conner shares of capital stock of Read-Rite (the "Shares") determined as follows:
>
> (a) In the event of an initial public offering of Read-Rite Common Stock pursuant to a registration statement on Form S-1 (an "Initial Public

Offering") which closes within sixty (60) days of the Closing Date, Read-Rite shall issue to Conner that number of shares of Common Stock $.0001 par value of Read-Rite determined by dividing $27,500,000 (subject to adjustment as provided in Section 2.2) by the per share price to the public in the Initial Public Offering.  Any fractional share shall be rounded to the nearest whole share.

The Asset Purchase Agreement also provided for an adjustment to the purchase price as follows:

> 2.2  <u>Adjustment to Purchase Price</u>.  The $27,500,000 aggregate consideration described in Section 2.1 shall be subject to adjustment, on a dollar for dollar basis, to the extent that the aggregate net value of the Inventory and Fixed Assets at the Closing, as determined in accordance with this Section 2.2, is greater than or less than $14,000,000.  Notwithstanding the foregoing, no adjustment shall be made for an aggregate deviation from $14,000,000 less than or equal to $500,000, and any adjustment shall be made only to the extent that such aggregate net value exceeds $14,500,000 or is less than $13,500,000.  To the extent that the Purchase Price after such adjustment exceeds $27,500,000, Read-Rite shall pay such excess amount to Conner in cash on the Closing Date.  To the extent that the Purchase Price after such adjustment is less than 27,500,000, the number of shares delivered to Conner shall be appropriately reduced.

Ernst and Young appraised the inventory and fixed assets in the amount of $5,266,237.  As a result, there was a net downward adjustment to the purchase price from $27,500,000 to $19,266,237.  Thus, while it was originally contemplated that Conner Malaysia would exchange its assets for 2,391,304 shares of Read-Rite stock, representing approximately 8.9 percent of Read-Rite's outstanding shares after the IPO, the actual number of Read-Rite shares that were delivered to Conner Malaysia was

1,675,325.  Read-Rite's underwriter, Hambrecht & Quist,

announced the purchase price adjustment in its Read-Rite company

report as follows:

> The original purchase price for the Conner HSA
> operation was $27.5 million in stock at the IPO price
> of $11.50.  Read-Rite, however, was able to
> dramatically lower the inventory levels of its own
> heads at the Conner HSA location before the transaction
> closed, resulting in a reduction in the actual purchase
> price to less than $20 million, and thus fewer shares.
> * * * [Emphasis omitted.]

In order to prevent Conner Malaysia from selling its shares

into the market immediately following the IPO, Read-Rite

required Conner Malaysia as part of the deal to agree to

restrictions upon how soon Conner Malaysia could sell the Read-

Rite shares.  Specifically, Read-Rite and Conner Malaysia agreed

that the Read-Rite shares that Conner Malaysia was to receive

would be freely tradeable at the closing of the IPO, subject to

a lockup agreement that prevented Conner Malaysia from selling:

(1) Any of the Read-Rite shares for 180 days following the

closing of the IPO; (2) two-thirds of the shares for 270 days

following the closing of the IPO; and (3) one-third of the

shares 1 year following the closing of the IPO.

These restrictions on the sale of the Read-Rite stock were

expressly included in the Asset Purchase Agreement.  In order to

prevent Read-Rite from amending the Asset Purchase Agreement to

allow a waiver or release of the sale restrictions, Read-Rite's

underwriters entered into separate agreements with Read-Rite.

These underwriting agreements prevented Read-Rite from unilaterally releasing Conner Malaysia from the restrictions on sale without the underwriters' express written consent.

On October 18, 1991, Read-Rite launched its IPO, and on October 26, 1991, the asset sale between Read-Rite and Conner Malaysia closed.  The delivery date of the shares under the Asset Purchase Agreement was November 14, 1991.

Conner Malaysia obtained a valuation by Unterberg Harris, an investment banking firm, of the appropriate discount applicable to the Read-Rite shares based upon the restrictions on sale.  The discount applied to the Read-Rite shares took into account the lockup provisions applied to the shares.  The discounted value or book "cost" of the Read-Rite shares was calculated to be $16,648,542.  For financial reporting purposes, Conner Malaysia calculated the gain realized on the sale of the its assets to be $11,282,490.  This figure was derived by subtracting the book value of the assets from the discounted value of the Read-Rite stock.

Pursuant to the Asset Purchase Agreement, the restrictions on Conner Malaysia's sale of the Read-Rite stock lapsed 180 days, 270 days and 1 year following the closing of the date of the Read-Rite IPO.  Once the restrictions lapsed, Conner Malaysia was free to keep or sell the shares as it wished.

On April 22, 1992, 180 days after the closing of the IPO, the sale restriction on the first one-third of Conner Malaysia's Read-Rite shares lapsed. On this date, the closing price of Read-Rite shares was $21-1/4 per share. On June 1, 1992, Conner Malaysia sold the first third of its Read-Rite shares (558,442 shares) at an average price of $20.31, yielding total proceeds of $11,341,147.65.

The price of Read-Rite shares fell by $.50 from April 22, 1992, the date the first restriction on the sale of shares lapsed, to June 1, 1992, the date Conner Malaysia sold the first one-third of its shares. Thus, by holding the 558,442 shares beyond April 22, 1992, Conner Malaysia lost $279,221 in proceeds that it would have received had it sold the shares on April 22, 1992.

On July 21, 1992, 270 days following the closing date of the IPO, the second restriction on sale lapsed. On this day, the closing price of Read-Rite shares was $23-1/8 per shares. On this day, Conner Malaysia sold 500,000 shares out of the 558,442 shares that it was then entitled to sell. Conner Malaysia sold the 500,000 shares for an average price of $23 per share, yielding proceeds of $11,500,000. Conner Malaysia sold the remaining 58,442 shares from the second one-third of its shares on November 11, 1992, at an average price of $26-1/2 per share, yielding proceeds of $1,548,713.

Between July 21, 1992, the date the second restriction lapsed, and November 11, 1992, the price at which Conner Malaysia sold the Read-Rite shares increased by $3-1/2 per share. Thus, by holding the 58,442 shares beyond the date the second sale restriction lapsed, Conner Malaysia earned an additional $204,547 over the amount it would have earned if it had sold the 58,442 shares on the date the restrictions lapsed.

On October 25, 1992, 1 year following the IPO closing date, the final restriction on sale lapsed. The closing price of Read-Rite shares at this time was $28-3/8. On November 11, 1992, Conner Malaysia sold all of its remaining Read-Rite shares (558,441 shares) at an average price of $26-1/2 per share. This sale yielded proceeds of $14,798,686.50.

Between October 26, 1992 and November 11, 1992, the price of Read-Rite shares fell by $1-7/8 per share. Thus, by holding the 558,441 Read-Rite shares beyond the date of the lapse of the third sales restriction, Conner Malaysia lost $1.05 million in proceeds that it would have received had it sold the shares on October 26, 1992.

In 1992, Conner Malaysia received gross proceeds of $39,188,546 from the sale of the Read-Rite shares. Conner Malaysia subtracted $16,648,542 (the discounted value of the Read-Rite Shares) from the gross proceeds of sale and reported a

book gain from the sale of the Read-Rite shares in the amount of $22,540,004.

## Discussion

The subpart F provisions (sections 951 through 964) require U.S. shareholders of a controlled foreign corporation (CFC) to recognize certain income (subpart F income) at the time the CFC earns that income, rather than later when such earnings are distributed as a dividend.[4] Subpart F income includes foreign base company income as determined under section 954. See sec. 952(a)(2). Under section 954(a)(1), foreign base company income includes foreign personal holding company income (FPHCI).

Current taxation of FPHCI under the subpart F regime is intended to tax "income which is passive in character." S. Rept. 1881, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 707, 788. In enacting the FPHCI subpart F provisions, Congress intended to tax income that arose from "portfolio types of investments" or "where the company [was] merely passively receiving investment income." Id. at 789.

Accordingly, gains arising from a CFC's passive or portfolio investments typically create FPHCI under section 954. See, e.g., sec. 954(c)(1)(A) (treating dividends, interest, rents and annuities as FPHCI) and (B)(i) (treating the proceeds

---

[4] The parties agree that Conner Malaysia is a CFC of Conner U.S.

on the sale of property that gives rise to dividends, interest, rents and annuities as FPHCI).

Consistent with the general congressional scheme of not including a CFC's income from conduct of an active trade or business within the definition of subpart F income, the regulations specifically exclude from the FPHCI definition gain from the sale of the operating assets of a CFC's active trade or business. See sec. 954(c)(1)(B)(iii); sec. 1.954-2T(e)(3)(iv), (v), and (vi), Temporary Income Tax Regs., 53 Fed. Reg. 27505 (July 21, 1988). Thus, under the subpart F income regime and the definition of FPHCI, a CFC's gain on the sale or exchange of property used in its trade or business does not constitute FPHCI.

The parties in this case agree that any gain from Conner Malaysia's sale of the assets constitutes gain from the sale of operating assets used in its trade or business and that, therefore, such gain does not constitute FPHCI. The issue before us is whether the portion of the gain relating to the increase in the value of the Read-Rite shares during the period in which Conner Malaysia was prohibited from selling the stock should be characterized by reference to the sale of the assets

or characterized as arising from a passive investment in the Read-Rite shares unrelated to the sale of the assets.[5]

Petitioner contends that Conner Malaysia's receipt and sale of the restricted Read-Rite shares were part and parcel of, and integrally related to, its sale of the assets. Therefore, petitioner argues that under the relation-back doctrine, the gain on the sale of the shares was inexorably tied to the gain on the sale of the assets and does not constitute foreign personal holding company income. Respondent contends that the facts in this case do not support the application of the relation-back doctrine and the gain on the sale of the stock cannot be characterized by reference to the earlier asset sale.

Generally, the relation-back doctrine, established by the Supreme Court in Arrowsmith v. Commissioner, 344 U.S. 6 (1952), stands for the principle that a subsequent event which is so integrally related to a prior event that the two events are in effect part and parcel of the same transaction, should be treated as having the same character as the prior event. The doctrine is premised on the idea that the tax consequences

---

[5] Petitioner admits that any net gain resulting from an increase in stock price after the lapsing of the sales restriction should constitute FPHCI.

should be the same as if the subsequent event had occurred at the time of the prior event.[6]

In <u>Arrowsmith v. Commissioner</u>, <u>supra</u> at 7, the taxpayers liquidated a corporation in which they had equal stock ownership. Partial distributions were made from 1937 to 1940, and the taxpayers classified and reported these distributions as capital gains in each year. In 1944, 4 years after the last distribution, a judgment was entered against the taxpayers as the corporation's transferees. Each taxpayer paid his or her share of the judgment and deducted his or her payment as an ordinary business expense. The Commissioner characterized the taxpayers' payments made pursuant to the judgment in 1944 as capital losses, not ordinary expenses, that arose out of the original 1940 liquidation. The Commissioner maintained that "the payment of the judgment 'grew out of, was related to, and took its character from a capital transaction'" and that the judgment payments could not be disassociated in their ultimate

---

[6] The relation-back doctrine is commonly employed to distinguish between capital and ordinary treatment of a transaction. The problem usually arises when a court must distinguish between capital and ordinary treatment in determining the character of a subsequent gain or loss which is directly related to an earlier transaction. To that end, courts routinely hold that if there has been an "adjustment", "renegotiation", or "revision" of the original selling price of the asset, the character of the subsequent transaction follows the character of the initial transaction. The relation-back doctrine has also been used to prevent taxpayers from receiving what is effectively a double benefit.

character from the distributions in liquidation which such payments would have served to diminish.  Bauer v. Commissioner, 15 T.C. 876, 878-79 (1950), revd. sub nom. Commissioner v. Arrowsmith, 193 F.2d 734 (2d Cir. 1952), affd. 344 U.S. 6 (1952).  The Supreme Court agreed with the Commissioner's position and held that the payments by the taxpayers were allowable only as capital losses because they arose from the earlier capital transaction.

Courts have applied the Arrowsmith v. Commissioner, supra, relation-back doctrine in favor of both the taxpayer and the Government in a myriad of factual settings.[7]  The relation-back doctrine has also been invoked under different labels, such as the "tax benefit rule" of United States v. Skelly Oil, 394 U.S. 678 (1969) or the "origin of claim" rule established in cases such as Clay v. Commissioner, T.C. Memo. 1981-375.  Regardless of the label given to the principle, this Court has consistently framed it as follows:

> the most appropriate tax treatment of the transaction
> in the later year is obtained by examining the

---

[7] For example, the relation-back doctrine has been utilized not only in the context of corporate liquidations, but also in the context of:  (1) Settling lawsuits or paying attorneys' fees in connection with a previous disposition of property, Kimbell v. United States, 490 F.2d 203 (5th Cir. 1974); (2) refunding or adjusting purchase prices, United States v. Skelly Oil Co., 394 U.S. 678 (1969); and (3) cases dealing with section 16(b) of the Securities and Exchange Act of 1934 (currently codified at 15 U.S.C. sec. 78p(b)), Brown v. Commissioner, 529 F.2d 609 (10th Cir. 1976), revg. T.C. Memo. 1973-275.

circumstances surrounding the related transaction in the earlier year, because of the relationship between the transactions, and it is immaterial whether such a result favors the taxpayer or the Government.

Bresler v. Commissioner, 65 T.C. 182, 186-187 (1975).  In Bresler, the taxpayers sold their small business corporation's section 1231 property at a significant loss in 1964.  The taxpayers reported their share of the loss on their own returns as a net operating loss that reduced their ordinary income.  In the same year, they commenced a lawsuit against a competitor for alleged antitrust violations, claiming damages that included the full amount of their loss from the sale of assets.  In 1967, the case was settled.  On the 1967 income tax return, the taxpayers claimed that the majority of the settlement proceeds was to reimburse them for the loss they realized upon the sale of their corporation's assets and that those proceeds were taxable as capital gain and not as ordinary income.  The Commissioner maintained that the proceeds should be treated as ordinary income.  The Tax Court, agreeing with the Commissioner and treating the proceeds as ordinary income, stated:

> If * * * [taxpayers' corporation] had received the antitrust settlement in * * * [1964], any portion representing compensation for the loss on the sale of its section 1231 property would have merely reduced its ordinary loss * * *.  Arrowsmith requires that the gain realized in 1967 be treated in the same manner as if it had been received in 1964.
>
> Since the gain, if received in 1964, would have resulted in an increase in ordinary income, it is not transformed into capital gain by a mere delay in

receipt.  The subsequent gain is part and parcel of the original loss transaction and cannot be segregated for tax purposes.  The gain in 1967 is merely an adjustment of the prior sale price; it is not a new and independent sale or exchange of section 1231 property. The receipt of the payment in 1967 was merely the completion of a prior transaction.  Arrowsmith requires us to treat both events as a unified transaction. * * * [Id. at 187; citations omitted; emphasis supplied.]

Simply stated, the doctrine set forth in Arrowsmith v. Commissioner, supra, is that the tax treatment of a transaction occurring in 1 year may control the tax treatment afforded a second transaction in a subsequent year where both transactions are integrally related.  This doctrine does not breach the principle of the annual accounting period because no attempt is made to reopen and readjust the treatment of the original transaction.  See id. at 8, 9.  In order for Arrowsmith v. Commissioner, supra, to apply, however, there must be a relationship between two transactions which is sufficient to require the conclusion that both transactions are parts of a unified whole.

In Arrowsmith, the Supreme Court found such relationship in part because the payment at issue would have been offset against the capital gain had both transactions occurred in the same year.  Likewise in Bresler v. Commissioner, supra, a sufficient relationship was found because the settlement proceeds paid in a subsequent year would have been offset against the original loss transaction had both events occurred in the same year.

The question we must ask, then, is whether the two transactions in this case were "part and parcel of one". Wener v. Commissioner, 24 T.C. 529, 532 (1955), affd. 242 F.2d 938 (9th Cir. 1957). If so, then the gain or loss in the subsequent year must take its character from the transaction in the earlier year. See Bresler v. Commissioner, 65 T.C. at 187; Arrowsmith v. Commissioner, 344 U.S. 6, 8 (1952).

We addressed an analogous situation in Slater v. Commissioner, 64 T.C. 571 (1975), and concluded that the relation-back doctrine did not apply. In Slater the taxpayer was granted an option to purchase restricted shares of his employer's stock. The taxpayer exercised his option in June 1968 and, when the restrictions lapsed in July 1969, recognized the difference between the stock's exercise price and its fair market value as ordinary income. The following year, in December 1970, the shares were sold at a loss. The taxpayer attempted to argue that, under the relation-back doctrine, the loss should be characterized as an ordinary loss by reference to the character of the gain that had been recognized when the restrictions lapsed. The taxpayer argued that because he had received the options as part of his employment, the loss on the shares should relate back to his employment.

We rejected the taxpayer's argument, finding instead that no relationship existed between the taxpayer's employment and

the loss on the sale of the shares.  We concluded that when the taxpayer purchased the stock, he became an investor in the stock, and any subsequent gain or loss is due to the fortunes of the company.  Accordingly, his loss was not found to be integrally related to the circumstances under which he acquired the stock, and we declined to apply the <u>Arrowsmith v. Commissioner</u>, <u>supra</u>, doctrine.

Petitioner argues that <u>Slater v. Commissioner</u>, <u>supra</u>, is inapposite because the sale giving rise to the recognition of the entire loss at issue in that case occurred 17 months after the restrictions on the stock lapsed.  Petitioner contends that no one, including the Commissioner, doubted that the restrictions on the shares of stock linked the taxpayer's exercise of the options in 1968 to his income from the shares in 1969.[8]

It is true that the taxpayer sold the stock 17 months after the restrictions lapsed and no argument was ever made that a portion of the loss was attributable to the restricted period.  Indeed, the restricted period was addressed in <u>Slater v. Commissioner</u>, <u>supra</u>, only to the extent that the taxpayers

---

[8] The reporting of the bargain element as ordinary income by the taxpayers in 1969 when the restrictions lapsed was not governed by the relation-back doctrine.  As such, we do not view petitioner's statement regarding the link between the exercise of the option and the reporting of the bargain element as instructive in determining whether the relation-back doctrine applies to the facts of this case.

reported additional ordinary income for the bargain element of the stock when the restricted period ended. What is important about <u>Slater</u>, however, is our statement that "When * * * [the taxpayer] purchased the stock at a bargain, it was as if he had been paid additional compensation which was used to purchase the stock; thereby, he became an investor in the stock, and any subsequent gain or loss is due to the fortunes of the company." <u>Id.</u> at 575. Thus, we considered the taxpayer in <u>Slater v. Commissioner</u>, <u>supra</u>, to have become an investor in the stock in June 1968, and we did not view the restricted period as altering when the taxpayer became an investor.

Similarly in the present case, we view petitioner as an investor in Read-Rite at the time the shares were received. We do not find the gain on the sale of the Read-Rite stock to be integrally related to the circumstances under which petitioner acquired the stock. After receiving the Read-Rite shares as consideration for the assets, Conner Malaysia became an investor in the stock, and any subsequent gain or loss was due to the fortunes of Read-Rite in the marketplace.

In addition, the value of the Read-Rite shares was independently determined upon sale by investors in the stock market, and was not integrally related to Conner Malaysia's former sale of assets to Read-Rite. Further, any gain or loss on the Read-Rite shares during the restricted period had no

impact on the agreed upon sales price of the assets. The Asset Purchase Agreement did not provide for an adjustment or revision of the purchase price at the end of the restricted period. As such, the first transaction terminated when the assets were sold, and the subsequent sale of the Read-Rite stock was a new transaction that should be considered entirely separate and independent for tax purposes. Accordingly, the facts of this case provide no basis for applying the relation-back doctrine of Arrowsmith v. Commissioner, supra.

Petitioner makes several contrary arguments. First, petitioner contends that the lockup agreement and restrictions on the Read-Rite shares were the integral links tying Conner Malaysia's sale of the Read-Rite shares to its receipt of the shares in exchange for the assets. According to petitioner, both the receipt of the Read-Rite shares and the sale restrictions imposed on Conner Malaysia by Read-Rite and its underwriters was an integral part of Conner Malaysia's sale of the assets. Thus, petitioner argues that the sale of the Read-Rite shares upon lapse of the sale restrictions arose out of and was part and parcel of the same transaction.

The fact that restricted stock was used as consideration for the asset sale does not integrally tie the two transactions together. Regardless of when Conner Malaysia could sell the Read-Rite shares, the subsequent sale of those shares did not

involve any adjustment, renegotiation, or revision of the original selling price of the assets. The restrictions simply prevented Conner Malaysia from selling the shares during the lockup period. The restrictions did not in any way change the value of the assets, or the aggregate consideration as stated in the Asset Purchase Agreement, that the parties agreed upon. Once the assets were sold, any fluctuations in the Read-Rite stock during the restricted period were due to the fortunes of Read-Rite and market forces and had nothing to do with the value of the assets sold. The two transactions were not tied together. For example, if the Read-Rite shares became worthless during the restricted period, it would not then follow that the assets became worthless as well. The assets had an agreed upon value, and any subsequent gain or loss on the Read-Rite shares had no effect on such value. As such, the fact that the consideration for the assets was restricted stock does not provide the requisite link for the application of the relation-back doctrine.

Petitioner also contends that the fact that the assets were purchased for stock, rather than cash, also provides the requisite link to apply the relation-back doctrine. While it is true that Read-Rite shares were ultimately received in exchange for the assets, it is also true that a purchase price was agreed upon and then paid in stock. The parties initially agreed to

sell the assets for $27,500,000, payable in Read-Rite shares. A subsequent adjustment based on an appraisal of the inventory and fixed assets reduced the aggregate consideration to $19,266,237. This amount represented the fixed, noncontingent purchase price for which Conner Malaysia agreed to sell its assets. The number of Read-Rite shares to be delivered to Conner Malaysia as consideration for the assets was determined by dividing this amount by the IPO per share price of Read Rite stock.

Nothing in the Asset Purchase Agreement gave any indication that the sales price for the assets could not be determined until the restrictions on the Read-Rite stock lapsed. There is also no indication in the Asset Purchase Agreement that any subsequent gain on Conner Malaysia's sale of the Read-Rite shares merely represented an adjustment or additional portion of the purchase price of the assets. Thus, the fact that the consideration for the assets was Read-Rite stock does not, by itself, provide an integral link between the two transactions.

Petitioner also cites several cases that were decided under the open transaction doctrine.[9] These cases, however, are

---

[9] Under the open transaction doctrine, the original transaction is held open and the resulting tax consequences are suspended, while under the relation-back doctrine, the original transaction is closed, and the subsequent taxable transaction receives its character based on the original transaction. Unlike the relation-back doctrine, the touchstone for use of the open transaction doctrine is the inability to value what was received in the original transaction.

irrelevant to our analysis since neither party is advocating for the application of the open transaction doctrine in the present case. Indeed, the fact that Conner Malaysia discounted and valued the restricted shares in 1991 indicates that they treated the asset sale as a closed transaction in 1991. Petitioner nevertheless argues that the logic and analysis used in Likins-Foster Honolulu Corp. v. Commissioner, 840 F.2d 642 (9th Cir. 1988), affg. T.C. Memo. 1985-572 and Dimond v. United States (In re Steen), 509 F.2d 1398 (9th Cir. 1975), are controlling in the instant case, even though those cases did not cite Arrowsmith v. Commissioner, supra, and were decided using the open transaction doctrine. We disagree. While similarities may exist between relation-back cases and open transaction cases, they nonetheless involve different principles, and we simply cannot rely on cases that were decided based on the open transaction doctrine in order to decide a case that, neither party disputes, involved a closed transaction.

Petitioner acquired the Read-Rite shares at a set price which was not at all dependent on what it subsequently obtained from unrelated third parties upon the sale of the restricted shares. Petitioner did not introduce any evidence that Conner Malaysia and Read-Rite intended the asset price to be determined after the Read-Rite shares were sold or the restrictions lapsed. The fact that Conner Malaysia assumed the risk that it was

selling its assets in exchange for stock that could be worthless by the time Conner Malaysia was free to dispose of it does not change the fact that any such decrease in the value of the shares was unrelated to the asset sale. Furthermore, the restrictions addressed the ability of Conner Malaysia to trade the Read-Rite shares and did not specifically prohibit Conner Malaysia from pledging the shares as collateral or borrowing against the shares during the lockup period. Thus, despite the restrictions, it was possible for Conner Malaysia to realize value from the Read-Rite shares during the restricted period, and any such value would be separate and independent from the asset sale.

In short, Conner Malaysia's receipt of the Read-Rite shares in exchange for its assets represents a transaction that is not part and parcel of Conner Malaysia's subsequent sale of such shares. The facts simply do not demonstrate the requisite link between the receipt of the Read-Rite shares and the subsequent sale of those shares necessary to apply the relation-back doctrine.[10]

---

[10] Respondent stresses that the relation-back doctrine has never been applied in the subpart F setting. We note that our conclusion that the relation-back doctrine is not applicable in the instant case does not necessarily bar the use of the relation-back doctrine in other situations within the subpart F arena.

In light of the foregoing and considering the facts of this case, we hold that the relation-back doctrine established in <u>Arrowsmith v. Commissioner</u>, <u>supra</u>, does not apply for purposes of characterizing Conner Malaysia's gain on the sale of the Read-Rite stock.  Accordingly, petitioner's gain on the sale of the Read-Rite stock constitutes FPHCI.

We have considered the parties' remaining arguments and find them either irrelevant or unnecessary for resolving the parties' controversy.  To reflect the foregoing,

<u>An order will be issued denying</u>
<u>petitioner's motion for partial summary</u>
<u>judgment and granting respondent's</u>
<u>motion for partial summary judgment.</u>